UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

STATE OF WEST VIRGINIA, <u>ex</u> <u>rel</u>.
PATRICK MORRISEY,
Attorney General,[1]

      Plaintiff,

v.                                    Civil Action No. 2:12-3760

AMERISOURCEBERGEN DRUG CORPORATION
a Delaware corporation
doing business in West Virginia, and
MIAMI-LUKEN, INC.,
an Ohio corporation
doing business in West Virginia, and
J.M. SMITH CORPORATION,
a South Carolina corporation
doing business in West Virginia
as Smith Drug Company, and
THE HARVARD DRUG GROUP, LLC,
a Michigan corporation
doing business in West Virginia, and
ANDA INC.,
a Florida corporation
doing business in West Virginia, and
ASSOCIATED PHARMACIES, INC.
an Alabama corporation
doing business in West Virginia, and
AUBURN PHARMACEUTICAL COMPANY
a Michigan corporation
doing business in West Virginia,
H.D. SMITH WHOLESALE DRUG COMPANY,
a Delaware corporation
doing business in West Virginia, and
KEYSOURCE MEDICAL INC.,

---

[1] On February 6, 2013, plaintiff moved to substitute name. This civil action was instituted by the then-sitting Attorney General Darrell V. McGraw, Jr.  On January 14, 2013, former Attorney General McGraw was succeeded by Patrick Morrisey.  It is ORDERED that the motion to substitute name be, and hereby is, granted. It is further ORDERED that the caption be, and hereby is, amended as set forth above pursuant to Federal Rule of Civil Procedure 25(d).

an Ohio corporation
doing business in West Virginia, and
MASTERS PHARMACEUTICALS, INC., and
an Ohio corporation
doing business in West Virginia, and
QUEST PHARMACEUTICALS, INC.,
a Kentucky corporation
doing business in West Virginia, and
RICHIE PHARMACAL CO., INC.,
a Kentucky corporation
doing business in West Virginia, and
TOP RX, INC.,
a Tennessee corporation
doing business in West Virginia

      Defendants.

## MEMORANDUM OPINION AND ORDER

      Pending is the plaintiff's motion to remand, filed August 27, 2012.

      Following receipt of the reply brief on October 1, 2013, the court provided the parties an opportunity to brief the court of appeals' recent decision in AU Optronics Corp. v. South Carolina, 699 F.3d 385 (4th Cir. 2012), which was handed down October 25, 2012.  The final supplemental brief was received on November 28, 2012.

      I.

      On June 26, 2012, the Attorney General of the State of West Virginia instituted this civil action as a part of the

Sovereign's continuing efforts to eradicate an alleged "epidemic of prescription drug abuse and its costs." (Compl. ¶ 1). The complaint provides as follows:

> Prescription drug abuse costs the State of West Virginia hundreds of millions of dollars annually. Beyond the actual dollars lost, prescription drug abuse devastates families, communities and reduces the State's economic productivity. Prescription drug abuse adversely affects West Virginia's hospitals, schools, courts, social service agencies, jails and prisons as well as diminishing the very quality of life in our cities and towns. Accordingly, the State, by its Attorney General, brings this action against parties whom the Attorney General has identified as having substantially contribut[ed] to and who have substantially, illicitly and tortiously benefitted financially from the prescription drug abuse problem in West Virginia.

(Id.). Those "parties whom the Attorney General has identified" include the defendant wholesale drug distributors, which are alleged to have engaged in the following wrongdoing:

> The Defendants . . . distribute various prescription drugs which are closely identified with the prescription drug abuse problem in West Virginia. These Defendants were on notice of the growing epidemic from the abuse of those prescription drugs which they supplied and of the quantities and frequency with which those drugs were distributed to entities in West Virginia. For reasons which are more specifically set forth in the following causes of actions these Defendants are answerable in damages to the State of West Virginia and are susceptible to such other relief as is requested.

> These Defendants are major distributors of controlled substances who have supplied controlled substances to drugstores which then dispense controlled substances based upon bogus prescriptions from physicians who are prescribing controlled substances for illegitimate medical purposes.

3

> Through their acts and omissions these Defendants
> have inserted themselves as an integral part of the
> pill mill process.

(Id. ¶¶ 2-4).

It is apparent that the Attorney General is seeking a recovery of damages for the State and not one or more of its individual citizens. For example, he details the costs to the State, both financial and otherwise, that have resulted from the alleged "prescription drug epidemic:"

> Costs to the State of as much as $430 million
> annually in the year 2010 with costs projected to be
> as much as $695 million annually by 2017;

> A per capita death rate from prescription drug
> overdose which has at times been either the highest or
> the second highest recorded for all states in the
> United States. One county, McDowell located in
> Southern West Virginia, had a death rate of 34.2 per
> 100,000 in 2001 and 97.3 in 2008;

> Between 2001 and 2008 West Virginia deaths from
> overdoses involving prescription drugs quadrupled from
> 5.1 deaths per 100,000 residents to 21.5;

> [T]he demand from the growing problem of addiction and
> management of addicted patients will eventually be too
> great for the available care provide[r]s unless the
> problem is addressed. Many of the addicted patients
> have no medical insurance coverage;

(Id. ¶ 6(a) - (d)).

The prescription drug problem is emphasized by certain specific examples found in the complaint as follows:

One pharmacy which is located in tiny Kermit, West Virginia in 2006 received 3,194,400 dosage units of hydrocodone which ranked 22nd in the nation among pharmacies with respect to purchases of hydrocodone dosage and 35th nationally if you include mail order pharmacies. The owner who is a licensed pharmacist has testified that the pharmacy filled one prescription per minute. Pharmacy records reveal that the pharmacy regularly paid suppliers hundreds of thousands of dollars, that virtually 90% of the drugs ordered and received . . . are of the kind associated with the prescription drug epidemic. The pharmacy reported revenue of more than $500,000 per month. Recently, an article described Kermit, population 300, as "ground zero" in the prescription drug epidemic;

One Pittsburgh area physician who has entered a guilty plea to a drug law violation allegedly worked in or owned an operation in Southern West Virginia which a federal investigation disclosed netted him personally as much as $20,000 per day in cash deposits made to his personal bank account. That so-called clinic was closed by the government resulting in seizure of hundreds of thousands of dollars in cash from physicians and others who were associated with the clinic;

(Id. ¶ 6(f) - (g)).

The pleading also discusses the burdens that prescription drug abuse visits upon the criminal justice system:

State prosecutors and judges lament that as much as 90% of their case load is regularly made up of matters which are either directly or indirectly related to prescription drug abuse. As one prosecutor recently told a Charleston newspaper "I have sometimes morbidly said I would welcome a cocaine case because at least not as many people are dying from cocaine abuse as they are from prescription drug abuse. I bring this up to point out foremost that we continue to ignore the human cost of substance abuse. Families are destroyed. People die. People can't get jobs and become homeless. They don't send their children to school, which ultimately contributes to truancy, delinquency,

> another generation of crime and a host of other
> problems. We're at the top of the nation in births of
> drug-addicted babies."

(Id. ¶ 6(h)).

The complaint contains eight counts.  Count One
alleges a violation of the West Virginia Uniform Controlled
Substances Act ("Controlled Substances Act").  The Attorney
General is statutorily authorized to "assist in the enforcement
of all provisions of . . . [the Controlled Substances Act] . . .
."  W. Va. Code § 60A-5-501(c).  He explains how he is
discharging that obligation here by reference to several steps.
First, the Controlled Substances Act directs the State Board of
Pharmacy to promulgate rules relating to the distribution of
controlled substances.  See W. Va. Code § 60A-3-301.

Second, the Board of Pharmacy drafted those rules.
One provision found therein, section 15-2-3.3.1, requires
distributors of controlled substances like the defendants to
obtain a permit.  Next, section 15-2-4.4 provides additionally
as follows:

> The registrant shall design and operate a system to
> disclose to the registrant suspicious orders of
> controlled substances. The registrant shall inform the
> Office of the West Virginia Board of Pharmacy of
> suspicious orders when discovered by the registrant.
> Suspicious orders include orders of unusual size,

orders deviating substantially from a normal pattern,
and orders of unusual frequency.

Id.

        In exercising his enforcement powers, the Attorney
General alleges that the defendants have "failed to diligently
respond to suspicious orders which the Defendants have filled"
and have "therefore failed to provide effective controls and
procedures to guard against" diversion of controlled substances
under the Controlled Substances Act.  (Compl. ¶ 16).  He seeks
injunctive relief to halt recurrent violations of that Act and
to stem the "enormous damages" that have been previously visited
upon the State. (Id. ¶ 19).

        Count Two alleges that the defendants' misfeasance in
violating the Controlled Substances Act, among other statutes,
has in turn caused liability to attach under the provisions of
West Virginia Code section 55-7-9, which states as follows:

    Any person injured by the violation of any statute may
    recover from the offender such damages as he may
    sustain by reason of the violation, although a penalty
    or forfeiture for such violation be thereby imposed,
    unless the same be expressly mentioned to be in lieu
    of such damages.

Id.

        Count Three alleges a violation of the West Virginia
Consumer Credit and Protection Act ("WVCCPA").  The Attorney
General asserts that the defendants engaged in both unfair

7

competition and unfair or deceptive acts or practices.  He
asserts that each violation of the Controlled Substances Act and
its regulations constitutes an unfair or deceptive act or
practice under the WVCCPA.  He seeks actual damages, statutory
damages, attorney fees and costs, and statutory penalties as a
result.

Count Four alleges a public nuisance.  The defendants
are accused of distributing the controlled substances, which are
subject to abuse and diversion, with the apparent or imputed
knowledge that the substances were not being prescribed and
consumed for legitimate medical purposes.  The alleged public
nuisance is said to have resulted in, <u>inter alia</u>, increased
crime and prison populations, diversion of law enforcement and
prosecutorial resources, and significant consumption of limited
healthcare resources.

Count Five is an unjust enrichment claim.  It asserts
that the prescription drug epidemic results in the State
expending hundreds of millions of dollars annually on issues
relating to the delivery of justice and rehabilitation while at
the same time forfeiting expected revenues that would otherwise
flow into the treasury but for resultant drug-related workplace
accidents and absenteeism.  The Attorney General asserts that
the defendants have correspondingly been unjustly enriched as a

result of neglecting their duty to distribute drugs only for proper medical purposes.

Count Six is a negligence claim.  It alleges that the defendants have failed to exercise reasonable care in the marketing, promotion, and distribution of the relevant controlled substances.  The breach is, again, said to have resulted in the State incurring excessive healthcare, treatment, and rehabilitation costs among other expenses.

Count Seven is a medical monitoring claim.  It alleges that the defendants' earlier recited tortious acts and omissions have exposed users and abusers of the controlled substances to the dangers of addiction and misuse.  The Attorney General asserts that monitoring, testing, and counseling are a reasonably probable consequence in order to prevent or lessen suffering or death.  He proposes a court-approved medical treatment monitoring program to assure "the relevant product users will . . . receive prompt medical care which could detect and prolong their productive lives, increase prospects for improvement and minimize disability."  (Compl. ¶ 66).  In doing so, he hopes to alleviate some of the burden imposed upon the State's coffers in addressing the same rehabilitative goals.

Count Eight arises under the West Virginia Antitrust Act ("Antitrust Act"), West Virginia Code section 47-18-1 et seq.  The Antitrust Act vests the Attorney General with broad powers.  He is authorized to investigate suspected violations of the Antitrust Act and to bring actions on behalf of the State to abate, and seek damages for, harm to the sovereign resulting from such violations.  See W. Va. Code § 47-18-6 ("The attorney general shall investigate suspected violations of, and institute such proceedings as are hereinafter provided for violation of the provisions of this article."); id. § 47-18-7; id. § 47-18-8 (providing for civil penalties and the institution of "proceedings to prevent and restrain violations of the" Antitrust Act); id. § 47-18-9 (providing for damage awards to "persons," noting the State and its agencies qualify as "persons", and authorizing the Attorney General to "bring an action on behalf of [the State or its agencies] to recover the damages provided for by" the Antitrust Act or federal law).

The Attorney General alleges that the defendants have violated the Antitrust Act in various ways, including the unreasonable restraint of commerce.  Specifically, the Attorney General asserts that the defendants have used unfair and deceptive business practices to attempt to obtain a dominant share in the West Virginia market for controlled substances.  He

further alleges a conspiracy between the defendants and "'pill mill' physicians and pharmacies who prescribe and fill these prescriptions for illegitimate purposes in order to restrain and monopolize trade in West Virginia for the 'pill mill' market." (Compl. ¶ 71).

        The relief sought by the Attorney General includes (1) a temporary and permanent injunction requiring notice to the Board of Pharmacy respecting suspicious orders for controlled substances, and (2) a jury trial to assess, inter alia, the following:

> a. Losses sustained as the proximate result of both negligent and conscious violations of the . . . Act and regulations;
>
> b. Damages sustained as the proximate result of nuisances created by the prescription drug abuse epidemic;
>
> c. Damages and losses sustained as the proximate result of the Defendants' negligence in marketing, promoting and distribution of controlled substances in West Virginia;
>
> d. Disgorgement of unjust enrichment of the Defendants;
>
> e. Treble damages under the . . . Antitrust Act.

(Compl. WHEREFORE clause).

        On July 26, 2012, the defendants removed.  The Attorney General now seeks remand.  He asserts that (1) the State is the only plaintiff and the real party in interest, (2)

that minimal diversity is lacking, and (3) that subject matter jurisdiction is unavailable under the Class Action Fairness Act ("CAFA").

The defendants respond essentially that (1) the complaint alleges private claims that the Attorney General is unauthorized to bring as parens patriae[2], (2) the real parties in interest are the affected citizens of the State who obtained the prescription medications, and (3) the Attorney General has fraudulently joined the Sovereign for the purpose of defeating diversity jurisdiction.  They additionally assert that this case is both a class action and a mass action under CAFA.

---

[2] The term means "parent of the country."  As noted by our court of appeals in AU Optronics, "A state may sue on behalf of its citizens as parens patriae when the interests of a group of citizens are at stake, as long as the state is also pursuing a quasi-sovereign interest."  AU Optronics, 699 F.3d at 388 n.5 (quoting United States v. Johnson, 114 F.3d 476, 481–82 (4th Cir. 1997) and In re Edmond, 934 F.2d 1304, 1310 (4th Cir. 1991) ("The state must be more than a nominal party without a real interest of its own; it must articulate an interest apart from the interests of ... particular private parties. . . ." (internal quotation marks omitted)).

II.

A.    Governing Standards in General

        "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Title 28 U.S.C. § 1441(a) governs federal removal jurisdiction and provides as follows:

> [a]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the . . . defendants . . . to the district court of the United States for the district and division embracing the place where such action is pending. . . .

28 U.S.C. § 1441(a).

        The burden of establishing removal jurisdiction falls upon the removing party.  Mulcahey v. Colum. Organic Chem. Co., 29 F.3d 148, 151 (4th Cir. 1994).  Our court of appeals has observed time and again that it is obliged to construe removal jurisdiction strictly:

> We have noted our obligation "to construe removal jurisdiction strictly because of the 'significant federalism concerns' implicated" by it.  Maryland Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 260 (4th Cir. 2005) (quoting Mulcahey, 29 F.3d at 151). . . .  Consistent with these principles, we have recognized that state law complaints usually must stay

13

> in state court when they assert what appear to be
> state law claims.  See, e.g., Harless v. CSX Hotels,
> Inc., 389 F.3d 444, 450 (4th Cir. 2004); King, 337
> F.3d at 424; Darcangelo v. Verizon Communications,
> Inc., 292 F.3d 181, 186 (4th Cir. 2002); Cook v.
> Georgetown Steel Corp., 770 F.2d 1272, 1274 (4th Cir.
> 1985).

Lontz v. Tharp, 413 F.3d 435, 440 (4th Cir. 2005).  "Any doubts

concerning the propriety of removal must be resolved in favor of

retained state court jurisdiction."  Marshall v. Manville Sales,

Corp., 6 F.3d 229, 232 (4th Cir. 1993).


B.    CAFA Governing Standards and Analysis


        CAFA is the source of statutory subject matter

jurisdiction relied upon by the defendants.  CAFA makes

removable both class actions and collective litigation known as

"mass actions."  The removing party is charged with the burden

of demonstrating federal jurisdiction for either a class or mass

action under CAFA.  Strawn v. AT & T Mobility LLC, 530 F.3d 293,

298 (4th Cir. 2008).  The statute represents a diversity-based

jurisdictional grant in class actions when there is minimal

diversity and the total amount in controversy exceeds

$5,000,000, exclusive of interests and costs.  Ferrell v.

Express Check Advance of SC LLC, 591 F.3d 698, 702 (4th Cir.

2010) (quoting 28 U.S.C. § 1332(d)(2)(A)); see also Palisades

Collections LLC v. Shorts, 552 F.3d 327, 331 (4th Cir. 2008).

In order to satisfy the minimal diversity requirement, any one member of the class of plaintiffs must be a citizen of a state different from any defendant.  AU Optronics, 699 F.3d at 388 (quoting 28 U.S.C. § 1332(d)(2)(A)).  It is equally clear, however, that the State is not counted in the mix inasmuch as it is not a citizen for diversity purposes.  Id. at 388 (quoting Moor v. Alameda County, 411 U.S. 693, 717 (1973) ("There is no question that a State is not a 'citizen' for purposes of the diversity jurisdiction.").

The definition of a CAFA class action is found in 28 U.S.C. § 1332(d)(1)(B): "[A]ny civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action[.]"  28 U.S.C. § 1332(d)(1)(B).

A "mass action," as summarized by the panel in AU Optronics, "must . . . satisfy CAFA's minimal diversity requirement, its numerosity requirement of 100 or more persons, and its amount-in-controversy requirement that all claims, when aggregated, must exceed $5,000,000 and an individual claim must exceed $75,000."  AU Optronics, 699 F.3d at 390.

Moving to the analysis of these rules in light of the allegations, one can rapidly appreciate that the central issue is whether the State is the real party in interest.  If it is, minimal diversity cannot possibly exist.  The defendants assert that the real parties in interest on the plaintiff side are in actuality "a large number of West Virginia residents" rather than the State.  (Resp. to Rem. Mot. at 3).  They assert that, irrespective of the one claim that the Attorney General is statutorily authorized to bring, he is additionally pursuing individual claims belonging only to private parties.  They contend that, following CAFA, "if the Attorney General is the real party in interest to only one of the claims in his multi-claim complaint, minimal diversity would be established and the action would be removable."  (Resp. to Rem. Mot. at 6).

The law in our circuit has advanced considerably in the interval between the defendants' response brief and this writing.  At the time the defendants penned their submission, the court of appeals had not yet weighed in on a then-developing split of authority that drives the outcome in this matter.  The split involves the method for analyzing a complaint under these circumstances, namely, whether the court undertakes a "claim-by-claim approach" or, alternatively, a "whole-case approach."

The claim-by-claim approach requires the complaint to be disassembled and a decision made respecting whether the State is the beneficiary of each basis for relief.  If anyone other than the State benefits from a particular claim under this approach, that other party is deemed a plaintiff real party in interest.  In contrast, the whole-case approach examines the entirety of the complaint and ascertains what interest the State possesses in the lawsuit as a whole.

In AU Optronics, the court of appeals aligned itself with the two circuits that chose the whole-case approach.  The analysis is worth quoting at length:

> South Carolina's claims for relief in these cases are each unique to the State and are consistent with its role as parens patriae, inasmuch as the State possesses a quasi-sovereign interest in enforcing -- in state court -- its laws with respect to price-fixing conspiracies. Furthermore, South Carolina is the sole named plaintiff in these lawsuits. Indeed, the provisions of the Antitrust Act and SCUTPA invoked in the complaints designate the State as the proper plaintiff.
>
> We are therefore satisfied to resolve these petitions for permission to appeal by adopting the whole-case approach and rejecting the claim-by-claim approach. [T]he nature and effect of these actions demonstrate that South Carolina is the real party in interest, a fact that is unencumbered by the restitution claims. We therefore agree with the Ninth and Seventh Circuits that a claim for restitution, when tacked onto other claims being properly pursued by the State, alters neither the State's quasi-sovereign interest in enforcing its own laws, nor the nature and effect of the proceedings. The purpose of these cases is the protection of the State's citizens

<u>and upholding the integrity of South Carolina law. The
State, in these parens patriae actions, is enforcing
its own statutes in seeking to protect its citizens
against price-fixing conspiracies. That the statutes
authorizing these actions in the name of the State
also permit a court to award restitution to injured
citizens is incidental to the State's overriding
interests and to the substance of these proceedings.</u>
Those citizens are not named plaintiffs here, and they
need not be considered in the diversity analysis of
the State's claims. Thus, CAFA's minimal diversity
requirement is not satisfied in either of these cases,
and the district court properly remanded them to state
court.

<u>AU Optronics</u>, 699 F.3d 385, 394 (4th Cir. 2012)(emphasis added).

    One strains to read the complaint herein to reach

individual claims for individual damages.[3]  The pleading is

positively permeated with the notion that the defendants'

monitoring and control failures have significantly contributed

---

[3]    To the extent that the defendants invite the court to
dismiss certain claims at this point based upon the Attorney
General's alleged inability to pursue them, it would be
inappropriate to do so prior to assessing subject matter
jurisdiction.  Whether the WVCCPA or any other theory of
recovery will pass muster under Rule 12(b)(6) matters not at
this point, as noted by binding precedent in an analogous area:

        Jurisdictional rules direct judicial traffic. They
        function to steer litigation to the proper forum with
        a minimum of preliminary fuss. The best way to advance
        this objective is to accept the parties joined on the
        face of the complaint unless joinder is clearly
        improper. To permit extensive litigation of the merits
        of a case while determining jurisdiction thwarts the
        purpose of jurisdictional rules.

<u>Hartley v. CSX Transp., Inc.</u>, 187 F.3d 422, 425 (4th Cir. 1999).
The court will take up the viability of the claims to some
extent <u>infra</u>, but only in ascertaining if the State has been
fraudulently joined.

to the rampant abuse of prescription medications in the State. The complaint recites at multiple points the financial and human toll visited upon the Sovereign as a result of the crisis, affecting even something so basic as law enforcement and the delivery of justice.  In sum, the State wants the prescription drug epidemic halted and compensation for the past harms the alleged plague has visited upon its social welfare, health care, and justice systems.  To the extent individual damages might be theorized, they would play a bit role at most in the litigation. As in AU Optronics, "[t]he purpose [of the litigation . . . is . . . protection of the State's citizens and upholding the integrity of . . . [State] law.  The State . . . is enforcing its own statutes in seeking to protect its citizens . . . ." Id. at 394.[4]

The court thus concludes that the State is the real party in interest.  Inasmuch as it is not deemed a citizen for subject matter jurisdiction purposes, minimal diversity is

_____

[4] As noted earlier, South Carolina's claims in AU Optronics included the restitution relief sought on behalf of injured South Carolina residents.  Despite that claim, the court of appeals nevertheless viewed the case as a parens patriae action. In the case sub judice, individual, consumer-based relief is not the gist of the action.

absent.  It follows that this case qualifies neither as a class
action nor a mass action under CAFA.[5]


C.    Fraudulent Joinder Governing Standards and Analysis


        The foregoing analysis measurably simplifies
discussion of the defendants' fraudulent joinder allegation.  As
pronounced in a different setting, the governing standard lays a
"heavy burden" upon a defendant removing a case on such grounds:

> "In order to establish that a nondiverse
> defendant has been fraudulently joined, the removing
> party must establish either: [t]hat there is <u>no</u>
> <u>possibility</u> that the plaintiff would be able to
> establish a cause of action against the in-state
> defendant in state court; or [t]hat there has been
> outright fraud in the plaintiff's pleading of
> jurisdictional facts."

<u>Mayes v. Rapoport</u>, 198 F.3d 457, 464 (4th Cir. 1999) (emphasis
in original) (quoting <u>Marshall v. Manville Sales Corp.</u>, 6 F.3d
229, 232 (4th Cir. 1993)).  The applicable standard "is even
more favorable to the plaintiff than the standard for ruling on

---

[5] The defendants also mention the Supreme Court's observation
that class actions, rather than <u>parens</u> <u>patriae</u> actions, are the
favored means for pursuing antitrust claims such as the Count
Eight cause of action alleged by the Attorney General.  (Def.'s
Mem. in Supp. at 13 (citing <u>Louisiana ex rel. Caldwell v.</u>
<u>Allstate Ins. Co.</u>, 536 F.3d 418 (5th Cir. 2008)).  The decision
in <u>Caldwell</u> noted that the Supreme Court in <u>Hawaii v. Standard</u>
<u>Oil Co.</u>, 405 U.S. 251 (1972) had "concluded by observing that
class actions, rather than <u>parens</u> <u>patriae</u> actions, are the
preferred vehicle for addressing antitrust violations").
        The court notes only that the cited "preference" does not
create CAFA jurisdiction where none otherwise exists.

a motion to dismiss[.]"  <u>Hartley v. CSX Transp., Inc.</u>, 187 F.3d
422, 424 (4th Cir. 1999).

  The defendants assert that the Attorney General is
forbidden from pursuing certain claims he alleges.[6]  They appear
to concede, however, that he is authorized to pursue the
Antitrust Act claim.  While they discuss the Attorney General's
lack of authority to pursue nearly all of the claims, they make
no similar contention respecting the Antitrust Act count.  (<u>See</u>
Def.'s Mem. in Supp. at 12 (stating that "the Attorney General
is not authorized to pursue seven of the eight claims in his
complaint").

  Although they do assert that the Attorney General's
allegations "are the antithesis of the restriction of trade,"
(<u>Id.</u> at 20), the allegations surely offer the possibility of a

---

[6] To the extent the defendants also assert that individual,
unnamed citizen are the necessary real parties in interest on
certain claims, if any, that the Attorney General is
unauthorized to pursue, they misconceive the nature of the
complaint.  The pleading plainly seeks relief on the State's
behalf alone.  If it is ultimately determined, by a court vested
with subject matter jurisdiction, that the Attorney General is
unauthorized to pursue one or more of the State's claims,
partial or complete dismissal would follow.  That is so inasmuch
as no citizen is apparently authorized to recover on behalf of
the State in a setting such as this.

right to relief.[7]  That alone suffices to overcome a claim of fraudulent joinder.

Inasmuch as the State is the real party in interest, and that it has not been fraudulently joined, there is no basis for the exercise of subject matter jurisdiction under CAFA.  It is, accordingly, ORDERED that the plaintiff's motion to remand be, and it hereby is granted.[8]

_____

[7]  The defendants relegate to a footnote certain additional theories, namely, that the Attorney General lacks parens patriae standing inasmuch as the injuries claimed are too remote or speculative, (2) that the economic loss rule prevents pursuit of a negligence claim under these circumstances, and (3) the alleged prescription drug abuse is caused by intervening criminal acts for which the defendants cannot be held responsible.  To the extent these challenges seek dismissal of the State's claims, they are premature at the jurisdictional stage.  To the extent they are offered as a basis for fraudulent joinder, the defendants have failed to demonstrate that there is lacking the slightest possibility that the claims would be permitted to proceed.

[8]  The Attorney General additionally seeks pursuant to 28 U.S.C. § 1447(c) the costs and expenses, including attorney fees, that have resulted from removal.  The defendants have failed to demonstrate removal jurisdiction.  The assertions offered in support of removal, however, are not objectively unreasonable. See Martin v. Franklin Cap. Corp., 546 U.S. 132, 141 (2005) ("Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal.").  The court, accordingly, ORDERS that the request for costs and fees be, and it hereby is, denied.

The Clerk is directed to send a copy of this written opinion and order to counsel of record and any unrepresented parties.

DATE:  March 27, 2013

John T. Copenhaver, Jr.
United States District Judge